**SARA M. PELQOUIN**
California State Bar No. 254945
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467, ext. 3716

Attorneys for Mr. Ayon-Cortez

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE IRMA E. GONZALEZ)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 08CR0283-IEG |
| Plaintiff, | ) | DATE: April 7, 2008 |
| | ) | TIME: 2:00 P.M. |
| v. | ) | |
| | ) | STATEMENT OF FACTS AND |
| ENRIQUE AYON-CORTEZ, | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN SUPPORT OF |
| Defendant. | ) | DEFENDANT'S MOTIONS |
| | ) | |

**I.**

**STATEMENT OF FACTS**

On January 6, 2008, Mr. Ayon-Cortez was walking alone along Highway 94, when he was approached by Agent Baisley. In contrast, Agent Baisley asserts in the probable cause statement that he observed Mr. Ayon-Cortez hiding in the brush along the highway. Mr. Ayon was approximately two miles North of the United States- Mexico Border. There is no allegation that Agent Baisly was responding to a citizen report, seismic sensor or any other Border Patrol intelligence that a suspected illegal alien was traveling on foot along Highway 94. Nevertheless, Agent Baisley stopped, and interrogated Mr. Ayon regarding his immigration status and his country of citizenship. It is undisputed that Mr. Ayon-Cortez was not advised of his *Miranda* rights prior to this interrogation. Mr. Ayon-Cortez is alleged to have made inculpatory statements regarding his alienage and immigration status. Mr. Ayon-Cortez was then transported

1   to the Tecate Processing Center.  There, Agent Baisely informed Mr. Ayon-Cortez of his *Miranda* rights.

2   Mr. Ayon-Cortez exercised these rights by electing to remain silent.

## II.

### THIS COURT SHOULD DISMISS THE INDICTMENT BECAUSE THE GRAND JURY INSTRUCTIONS WERE IMPROPER

The Court should dismiss the indictment due to the improper instructions given to the grand jury. The arguments in this regard are essentially those set out in the dissents in <u>United States v. Marcucci</u>, 299 F.3d 1156 (9th Cir. 2002), and <u>United States v. Navarro-Vargas</u>, 367 F.3d 896 (9th Cir. 2004), in which the majority opinions are contrary to Mr. Ayon-Cortez' position.  Accordingly, the issues discussed in those opinions, and the discussion and proposed holdings of the dissents, are asserted herein to preserve them for further appeal.  A copy of the relevant grand jury transcript is available if the Court so requests.  Mr. Ayon-Cortez hereby offers to submit further briefing and argument if the Court desires.

## III.

### THIS COURT SHOULD SUPPRESS ALL STATEMENTS MADE BY MR. AYON-CORTEZ

**A.  The Court Must Suppress Mr. Ayon's Alleged Statements Because They Were Obtained During a Stop Unsupported By Reasonable Suspicion and In Violation of the Fourth Amendment.**

The Fourth Amendment protects individuals from unreasonable searches and seizures by government agents.  Although, by its text, the Fourth Amendment requires probable cause to justify the arrest of an individual, the Supreme Court has approved seizures of limited duration and scope based upon a reasonable suspicion that criminality is afoot.  <u>Terry v. Ohio</u>, 391 U.S. 1 (1968).  Border Patrol Agents do not have the unfettered right to approach any person near the border to inquire regarding citizenship and immigration status. Rather, they are bound by the Fourth Amendment requirement that they have specific and articulable facts rising to a particularized suspicion that the person to be questioned is an illegal alien.  <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873 (1975); <u>United States v. Manzo-Jurado</u>, 457 F.3d 928 (9th Cir. 2006); <u>United States v. Montero-Camargo</u>, 208 F.3d 1122.

The existence of reasonable suspicion is evaluated under the totality of the circumstances.  <u>Terry v. Ohio</u>, 391 U.S. 1; <u>United States v. Arvizu</u>, 534 U.S. 266; <u>United States v. Montero-Camargo</u>, 208 F.3d 1122

1  (9th Cir. 2000).  Various factors have been taken into consideration when evaluating the existence of

2  reasonable suspicion to stop and enquire regarding alienage and immigration status, including: proximity

3  to the border; notoriety of the area for alien smuggling activity; and, the suspicious or evasive conduct of

4  the person stopped.  United States v. Brignoni-Ponce, 422 U.S. 873; United States v. Manzo-Jurado, 457

5  F.3d 928; United States v. Montero-Camargo, 208 F.3d 1122.

6        The Arvizu case demonstrates how the totality of the circumstances can rise to the level of reasonable

7  suspicion. 534 U.S. at 277.  In Arvizu, the agent articulated the following facts:

8      1.    a magnetic sensor alerted the agent to the presence of a vehicle on an unpaved, seldom traveled road used by smugglers to avoid Border Patrol checkpoints, Arvizu, at 268;
9
10     2.    the sensor alert occurred during a change in shifts which would leave the area unpatrolled by the agents, Id.;
11     3.    the same sensor had detected a minivan using the same route several weeks before which resulted in a marijuana seizure, Id., at 269-270;
12     4.    a second sensor signal indicated to the agent that the vehicle had turned onto another unpaved road on a route commonly used to circumvent checkpoints, Id., at 270;
13     5.    when the agent intercepted the vehicle, it turned out to be a minivan, Id.;
    6.    when the agent followed the minivan, he noted that the occupants, who appeared to be a family, behaved strangely, first ignoring him and then waving in a mechanical manner, Id., at 270-271;
14
15     7.    the agent could see the children's knees, which indicated that their feet rested on some cargo. Id., at 270;
16     8.    the van turned onto a third, even rougher unpaved road, away from any checkpoint, and away from any destination a family might want to reach for recreation, Id., at 271; and
17     9.    a radio check by the agent indicated that the minivan was registered to an address four miles from the international border in a neighborhood notorious for smuggling activity, Id., at 271.
18
19       As a result, the agent in Arvizu had reasonable suspicion to perform an investigatory stop of the

20 minivan because he could:

21     infer from his observations, his registration check, and his experience that ... [the minivan] had set out ... along a little-traveled route used by smugglers to avoid the ... checkpoint[s] ... at a time when officers would be leaving their ... shifts ... on unpaved and primitive roads.
22
23
Arvizu, 534 U.S. at 277.
24

25       In this case, the totality of the circumstances do not rise to a particularized suspicion that Mr. Ayon

26 -Cortez was an illegal alien.  The encounter in question occurred two miles from the international border

27 on a highway.  Although this is not an extensive distance from the border, it certainly does not lead to an

28 inevitable conclusion of a recent crossing, the way an encounter mere yards from the border fence might

suggest.  Agent Baisly did not report any Border Patrol intelligence suggesting the presence of an illegal alien was suspected in the area, such as a citizen report.  Nor does Agent Baisly suggest that this area of Highway 94 is renown for the presence of illegal aliens.  Agent Baisly relies on the assertion that Mr. Ayon-Cortez was engaged in evasive behavior by hiding in the brush, a fact in dispute.  Agent Baisly's assertion that Mr. Ayon-Cortez was "hiding" is conclusory at best as he does not allege whether Mr. Ayon-Cortez was crouching, lying down, sitting down to eat his lunch, or tying his shoes.

The mere presence of a pedestrian, by the side of a highway, close to the border does not amount to reasonable suspicion that the person is an illegal alien.  Thus, the stop violated the Fourth Amendment and any statements obtained must be suppressed.  At minimum, the Court should grant an evidentiary hearing to test the basis of Agent Baisly's suspicion and resolve issues of factual dispute.

**B.      The Court Must Suppress Mr. Ayon-Cortez' Alleged Pre-Miranda Field Statements Because They Were Elicited as the Result of Custodial Interrogation.**

The material produced thus far by the government indicates that Agent Baisly first confronted and interrogated Mr. Ayon-Cortez, regarding his immigration status, by the side of Highway 94, two miles north of the International Border.  This entire interrogation proceeded any form of administration of Miranda rights by the agents by approximately five hours.

"The ruling in Miranda prohibits 'custodial interrogation' unless the government first gives warnings to the [subject of the interrogation]." United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1046 (9th Cir. 1990).  Custodial interrogation occurs when under the totality of the circumstances the questions asked by the police are reasonably likely to elicit an incriminating response from the subject. Id.  Although questions that include routine biographical information usually do not trigger the safeguard of Miranda v. Arizona, "[t]hat exception is inapplicable . . . where the elicitation of information regarding immigration status is reasonably likely to inculpate the [subject]." Id.

//
//
//
//
//

In United States v. Kim, 292 F.3d 971, 973 (9th Cir. 2002),[1] the Ninth Circuit noted that the following factors are to be considered in deciding whether or not a police-dominated atmosphere exists: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." Id. (citations omitted); see also United States v. Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980) (in context of custody at the border "[t]he factors to be weighed are the language used to summon him, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the pressure exerted to detain him."). The Ninth Circuit also recognizes that "question[s] implying that [the agent] suspected [the defendant] of criminal activity" can give rise to a reasonable belief that one is not free to ignore the questions and leave. United States v. Chavez-Valenzuela, 268 F.3d 719, 725 (9th Cir. 2001).[2]

It is not necessary that an individual be physically restrained in any fashion. In Beraun-Panez, the Ninth Circuit found that an individual questioned out in an open field, who was neither held nor handcuffed nor told that he was under arrest, was nonetheless in custody for Miranda purposes. Beraun-Panez held that "[a]lthough not physically bound, Beraun-Panez was subjected to psychological restraints just as binding." 812 F.2d at 580.[3]

Here, the criteria for a police-dominated atmosphere as articulated in Kim are clearly met. The report does not state the exact words Agent Baisly used to identify himself as a border patrol agent and to get Mr. Ayon-Cortez to stop walking toward his destination. Whichever words used unambiguously indicated to Mr. Ayon-Cortez that Agent Baisly was a law enforcement officer and that Mr. Ayon-Cortez was in

---

[11] In Kim, the Ninth Circuit found that a Korean woman who went to her own store, voluntarily, because an officer's visit prompted her to do so was in custody even though she was in familiar surroundings because the police "temporarily took over complete control of Kim's store creating a 'police-dominated atmosphere.'" 292 F.3d at 977. This combined with difficulty with English and isolation from family supported the finding that Kim did not willingly agree to submit to an encounter with the police. Id.

[3] Chavez-Valenzuela involved a roadside stop of a motorist on a public street, out in the open.

[4] The police confronted Beraun-Panez with his alienage, accused him of lying and kept him separated from his co-worker in a remote rural area. Beraun-Panez, 812 F.2d at 580.

custody. Because Agent Baisly was in uniform, carrying his gun, and Mr. Ayon-Cortez was a pedestrian in an isolated area, Mr Ayon-Cortez reasonably did not feel free to leave.

Concerning the extent to which Mr. Ayon-Cortez was confronted with guilt, he was apprehended and immediately interrogated about his immigration status. It is, however, unclear how long the detention took place or the amount of pressure applied to Mr. Ayon-Cortez since Agent Baisly's report does not address the duration of the interrogation and detention and only uses boiler-plate language to describe Mr. Ayon-Cortez' responses. Agent Baisly confronted and interrogated Mr. Ayon-Cortez regarding his suspected criminal activity of being unlawfully present in the United States without the benefit of Miranda warnings. Thus, the statements must be suppressed.

Not only did the questioning here occur in a "police-dominated atmosphere" where Mr. Ayon-Cortez was isolated, the agent's questioning bore on Mr. Ayon-Cortez' alienage, which is an element of the charged offense, 8 U.S.C. § 1326. See United States v. Meza-Soria, 935 F.2d 166, 171 (9th Cir. 1991). This question in such a setting carried with it implicit suspicion of criminal activity. A person, such as Mr. Ayon-Cortez, subjected to such questioning in such a situation obviously does not reasonably feel free to leave, and thus is subject to custodial interrogation. See Chavez-Valenzuela, 268 F.3d 719, 725 (9th Cir. 2001).

In the context of an encounter between border patrol and an individual near the international border, any questioning regarding an individual's alienage falls under the rubric of custodial interrogation. Furthermore, because of the close relationship between civil and criminal immigration investigations, "[c]ivil as well as criminal interrogation of in-custody defendants by INS [agents] should generally be accompanied by the Miranda warnings." United States v. Mata-Abundiz, 717 F.2d 1277, 1279 (9th Cir. 1983).

In United States v. Gonzalez-Sandoval, 894 F.2d at 1043 (9th Cir. 1990), the defendant appeared at a local police station to provide his state parole officer with a urine sample. Id. at 1046. A second parole officer accused Mr. Gonzalez-Sandoval of being a deported alien and called the Border Patrol. Id. The Border Patrol came to the station, and without warning him pursuant to Miranda, asked Mr.Gonzalez-Sandoval where he was born and whether he possessed documents to verify the legality of his presence in the United States. Id. The Border Patrol agents then took Mr. Gonzalez-Sandoval to the Calexico Border Patrol Station. Failing to administer the Miranda warnings a second time, the agents questioned

Mr. Gonzalez-Sandoval about any alias he possessed. Id. The agents ran an INS record check against Mr. Gonzalez-Sandoval's name and alias, and found Mr. Gonzalez-Sandoval's prior immigration record. Id. The Ninth Circuit found that the district court erred in failing to suppress the unwarned, prompted statements by Mr. Gonzalez-Sandoval about his name and alias. Id. at 1047.

In United States v. Mata-Abundiz, an INS agent visited the defendant in a state jail to obtain biographical information to determine the defendant's citizenship status. 717 F.2d at 1278. The agent knew about the state charges against Mr. Mata-Abundiz, and did not warn him pursuant to Miranda prior to obtaining the biographical data. Id. Afterwards, the agent made further inquiries at his office and within three hours returned to the jail to charge Mr. Mata-Abundiz with a federal immigration offense. Id. Despite the fact that the agent characterized his interrogation as pursuant to a civil investigation, the court held that the agent should have warned Mr. Mata-Abundiz as required by Miranda because the agent knew his interrogation could lead to federal charges against the defendant. Id. at 1278-1279.

Here, it is obvious that the information the agent elicited from Mr. Ayon-Cortez, during the interrogation, regarding his citizenship, application for permission to enter, and use of a document was "reasonably likely to inculpate" him. The questions served no purpose other than inculpation. They are in fact two of the four elements that they government must prove to obtain a conviction for a violation of 8 U.S.C. § 1326. Moreover, it is undisputed that Mr. Ayon-Cortez was not read his Miranda rights at that point, nor advised that his answers to the agent's questions could result in federal charges against him. Therefore, statements must be suppressed.

**C.    Mr. Ayon-Cortez' Statements Must Be Suppressed Because They Were Involuntary.**

Even when the procedural safeguards of Miranda have been satisfied, a defendant in a criminal case is deprived of due process of law if the conviction is founded upon an involuntary confession. Arizona v. Fulminante, 499 U.S. 279 (1991); Jackson v. Denno, 378 U.S. 368, 387 (1964). The government bears the burden of proving by a preponderance of the evidence that a confession is voluntary. Lego v. Twomey, 404 U.S. 477, 483 (1972).

In order to be voluntary, a statement must be the product of a rational intellect and free will. Blackburn v. Alabama, 361 U.S. 199, 208 (1960). In determining whether a defendant's will was overborne in a particular case, the totality of the circumstances must be considered. Schneckloth v. Bustamonte, 412

1  U.S. 218, 226 (1973). Some factors taken into account have included the youth of the accused, his lack of
2  education, his low intelligence, the lack of any advice to the accused of his constitutional rights, the length
3  of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment
4  such as the deprivation of food or sleep. Id.

5  A confession is deemed involuntary whether coerced by physical intimidation or psychological
6  pressure. Townsend v. Sain, 372 U.S. 293, 307 (1962). "The test is whether the confession was `extracted
7  by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by
8  the exertion of any improper influence.'" Hutto v. Ross, 429 U.S. 28, 30 (1976) (quoting Bram v. United
9  States, 168 U.S. 532, 542-43 (1897)). Accord, United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981).

10  Until the government meets its burden of showing all statements of the defendant that it intends to
11  use at trial were voluntary, all statements -- even those taken before he was in "custody" -- must be
12  suppressed as involuntary.

13  **D.    Mr.Ayon-Cortez Requests That This Court Conduct An Evidentiary Hearing.**

14  This Court must make a factual determination as to whether a statement was voluntarily given prior
15  to its admission into evidence. 18 U.S.C. § 3501(a). Where a factual determination is required, courts are
16  obligated by Fed. R. Crim. P. 12 to make factual findings. See United States v. Prieto-Villa, 910 F.2d 601,
17  606-10 (9th Cir. 1990). Because "'suppression hearings are often as important as the trial itself,'" id. at 609-
18  10 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not
19  merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.

20  Under section 3501(b), this Court must consider various enumerated factors in making the
21  voluntariness determination, including whether the defendant understood the nature of the charges against
22  his and whether she understood his rights. Without the presentation of evidence, this Court cannot
23  adequately consider these statutorily mandated factors. Mr. Ayon-Cortez accordingly requests that this Court
24  conduct an evidentiary hearing pursuant to 18 U.S.C. § 3501(a), to determine, outside the presence  of the
25  jury, whether any and all statements made by him were voluntary.

26
27
28

## IV.

## **MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS**

Defense counsel has received one-hundred and fifty-four pages of discovery at this time, however investigation of this case is not complete. Information that comes to light as a result of further investigation may necessitate the filing of additional motions. Therefore, counsel requests leave to file additional motions once investigation is completed.

## V.

## **CONCLUSION**

For the reasons stated above, Mr. Ayon-Cortez respectfully requests that this Court grant the foregoing motions.

Respectfully submitted,

Dated: March 25, 2008         */s/ Sara M. Peloquin*
                              **SARA M. PELOQUIN**
                              Federal Defenders of San Diego, Inc.
                              Attorneys for Mr. Ayon-Cortez

**CERTIFICATE OF SERVICE**

Counsel for Defendant certifies that the foregoing is true and accurate to the best information and belief, and that a copy of the foregoing document has been caused to be delivered this day upon:

Courtesy Copy to Chambers

Copy to Assistant U.S. Attorney via ECF NEF

Copy to Defendant

Dated:  March 25, 2008         */s/Sara M. Peloquin*
                               **SARA M. PELOQUIN**
                               Federal Defenders of San Diego, Inc.
                               225 Broadway, Suite 900
                               San Diego, CA  92101-5030
                               (619) 234-8467  (tel)
                               (619) 687-2666  (fax)
                               sara_peloquin@fd.org