

# Thin ICE

by **JACQUELINE STEVENS**

June 5, 2008

*This article appeared in the June 23, 2008 edition of* The Nation.

A headline in the *San Francisco Chronicle* screams, 900 Nabbed in State on Immigration Charges. The *Seattle Times* reports, Feds Combing Jails for Illegal Immigrants. An AP article declares, Immigration Raid in Iowa Largest Ever in US and reports 390 arrests. In 2007, 276,912 US residents were deported. Thanks to a recent Bush Administration crackdown, the net cast by the Immigration and Customs Enforcement Agency (ICE) is wide--so wide, it turns out, that some of those being deported are US citizens.

Is ICE an efficient law enforcement agency? Or, in the words of Robert, 38, a US citizen twice deported to Mexico, is ICE "just throwing us out for nothing"?

Consider what happened to Peter Guzman. Last year Guzman, a US citizen born in Los Angeles in 1977, drove onto the tarmac of a regional airport in his hometown of Lancaster, about eighty miles northeast of Los Angeles, boarded a charter plane without a ticket and refused to get off.



AP PHOTO/ACLU/SOUTHERN CALIFORNIA

Guzman was arrested and sentenced, and served forty-one days in a Los Angeles County jail. According to his lawyer, Mark Rosenbaum of the Southern California ACLU, Guzman was excited about being released in time for his brother's July wedding in Las Vegas. "It was a big deal to Peter. He was going to be the best man." It never occurred to Guzman that in July he'd be eating garbage and bathing in the Tijuana River.

But on May 11, 2007, he called his family and said he'd been deported. According to the ACLU lawsuit, before his sister-in-law could find out exactly where he was and give him instructions, the line was cut. She overheard him ask, "Where am I?"

In early August 2007, after Guzman had spent three months trying to return, his appeal to a border agent in Calexico was finally successful: Guzman was arrested for missing his first probation hearing and brought back to Los Angeles. ICE says it has Guzman's signature on a voluntary departure agreement. Guzman's attorneys say the signature was coerced and that it is never legal to deport a US citizen.

Gary Mead, ICE assistant director for detention and removal, testified at a Congressional hearing in February that Guzman's case is unique. But California Democratic Congresswoman Zoe Lofgren calls Guzman the "poster child" for an epidemic of detaining and deporting US citizens by ICE. Kara Hartzler, an attorney at the Florence Immigrant and Refugee Rights Project (FIRRP), agrees with Lofgren. Last year Hartzler's staff of six attorneys provided presentations and occasionally individual advice to more than 8,000 detainees in southern Arizona. About 10 percent of people ICE detains nationwide are sent to Florence and nearby Eloy, about sixty miles south of Phoenix. Hartzler testified, "The deportation of US citizens is not happening monthly, or weekly, but every day."

ICE does not keep records on cases in which detainees claim to be US citizens. If larger trends are consistent with the pattern in Hartzler's caseload, since 2004 ICE has held between 3,500 and 10,000 US citizens in detention facilities and deported about half. US citizens are a small percentage of ICE detentions for this period, which totaled around 1 million, but in absolute terms the figure is staggering.

Phone interviews suggest the higher end may be more accurate. I called fifteen private immigration attorneys whose names appear on a Justice Department list of pro bono attorneys in Los Angeles and left messages asking whether they had clients in the past three years who were US citizens held in ICE detention for at least one month. Seven of them called back, each describing one to four clients who meet these criteria. Using these accounts, and those from attorneys at three nonprofit immigration clinics, I documented thirty-one cases from across the country of US citizens, eight born here, incarcerated as aliens for one month to five years. Fourteen were deported. Five remain in detention.

Between 2001 and 2007 Robert, who requested that his last name be withheld, was incarcerated for five years and deported to Tijuana twice because ICE refused to believe he was a US citizen. Robert described meeting seventeen other US citizens in ICE detention. Robert was born in Mexico in 1970 and orphaned at age 4. When he was 8 his uncle from Baldwin Park, California, adopted him. In 1983 he became a legal permanent resident, automatically acquiring US citizenship.

In 2000 Robert was arrested for a DWI and evading arrest. After serving sixteen months, he was transferred to El Centro Detention Facility, about 100 miles east of San Diego, where ICE set about deporting him as a criminal alien.

Robert told the court and his attorney, to whom he paid $5,000, that he was a US citizen, but his

lawyer did not submit the necessary documents, and Robert lost the case. Robert believed an appeal was hopeless. The year he'd spent in detention was enough: "I decided to leave and come back [to the United States] the next day."

In February 2002 Robert disembarked from the ICE van in Tijuana with an order forever banishing him from the United States. The next day his sister-in-law picked him up and they drove into the United States together, telling the border agent they were US citizens, which they are. They drove to their homes in a Los Angeles suburb.

In 2003 Robert, fearful of being turned over to ICE, sped away from a police car signaling him to pull over. He was sent to a deportation center in Chino and had a video hearing: "You face the TV and some little judge is inside TV talking to you." He explained that he was a US citizen. The little judge ruled otherwise and told Robert an appeal would take nine months. Robert decided to repeat the 2002 routine. ICE again dropped him off in Tijuana.

Robert told the US patrol agent apprehending him during the middle of the night in the hills of El Centro, "I am a US citizen." The agent charged Robert with falsely impersonating a US citizen and other felonies associated with an illegal border crossing. The public defender told Robert to plead guilty to the impersonation charge, or he'd face additional time for entering the United States as an illegal immigrant. "I said, 'No, I can't. There's no way. I'm trying to tell you, my dad is a US citizen. I am a US citizen.' I told the judge that the things they're charging me with are not true, but I have no choice and if that's what it will take for me to go faster to my family, I will plead to that." Robert served three years for falsely impersonating a US citizen.

In 2006 Robert was released into ICE custody at Terminal Island in San Pedro. At this hearing the immigration judge considered the information Robert had assembled in the prison library and realized he was probably a US citizen. Robert was released on bond to find the relevant documents and a lawyer. A few months later Robert and his new attorney, Veronica Villegas, went to the Los Angeles United States Citizenship and Immigration Services office. Villegas told me, "The agent looked at his papers and said, 'Congratulations! You've been a US citizen since 1983.'"

ICE has no jurisdiction over US citizens. If someone claims birth in the United States, as Guzman did, then ICE agents must have a "reasonable suspicion" for disbelief before detaining him. Racial profiling doesn't count. "Not speaking English, not being white and appearing to be from a Central American country is not enough," says Rebecca Musarra, of the Human Rights Impact Litigation Clinic of Washington College of Law. In practice, ICE detains thousands of people who were born in the United States and forces them to prove citizenship. According to Mario Quiroz at Casa de Maryland, which assists low-income Latinos, "People who have Spanish names, are five-four, have black hair, get profiled. At the end of the day, [ICE] only says, 'Oops, we made a mistake.' But somebody's life was messed up."

Proving citizenship can be tough, especially when the people who might help can't find you. An immigration judge, who requested anonymity, told me it was "notoriously common for people to be whisked away and nobody knows where they are. When you just want to get rid of someone, you don't want their family to know where they are. It's something that would happen in a Third

World country. It's not something that should happen [here]."

Pastor Aquiles Rojas agrees. On October 11, 2007, he went to pick up his brother-in-law from a two-month sentence at the Honor Farm jail in Modesto, California. René Saldivar, 38, wasn't there. "They told me that immigration had taken him, and they didn't know where he was," says Rojas. He called everywhere: San Francisco, Sacramento, Arizona. "They told me they had no record of my brother-in-law. We thought maybe he was in Mexico, but we couldn't figure out why he didn't call. Certainly he was in trouble. We just wanted to find out where he's at." Saldivar's family was especially concerned because of Saldivar's impaired psychological condition.

After the family's five-month vigil, Saldivar called. He was in the Eloy Detention Center in Arizona. Saldivar told me, "I didn't have no money and no way of talking to nobody." The center allows collect calls but cellphone plans will not accept them. Eventually a stranger lent Saldivar a calling card. In February Saldivar explained his ancestry to an immigration judge, who concluded that Saldivar most likely was a foreign-born citizen--like John McCain and George Romney--and sent the case to FIRRP.

Hartzler told me she thought she could get Saldivar released at his hearing on April 9, but she had to track down the Social Security employment records of her client's deceased father to prove his citizenship. She wrote, "I don't think it's appropriate for government proceedings with consequences as severe as lifetime deportation to rely on nonprofit organizations for their safeguards. For every René, there's dozens of people with valid claims to US citizenship who are deported."

Detainees with psychological disabilities find it especially hard to navigate their release, but according to a FIRRP social worker, Erin Maxwell, "Even people who are not diagnosably mentally ill or developmentally challenged still don't really get [why they're in deportation proceedings], and it can be very scary." One client of hers was arrested for possessing drug paraphernalia and then detained at Eloy for four months. "He didn't bring up his citizenship with the judge," Maxwell said. "Then I met with him and he said, 'I don't know why this is happening. Both my parents are US citizens.'"

According to Nancy Morawetz, a New York University Law School professor supervising the Immigrant Rights Clinic, "a lot of people don't know they're citizens." The rules for foreign-born citizenship are complicated. Different laws apply to different years of birth. Since the state does not guarantee legal representation in civil cases, 90 to 95 percent of detainees lack attorneys. Even the immigration lawyers seem not to understand the laws, the immigration judge told me. So it's not surprising that Saldivar's eleven siblings are just learning that they, too, are US citizens.

For the millions of US citizens who are foreign-born, court precedents shift the burden of proving citizenship onto them. But the Fourteenth Amendment states that "all persons born or naturalized in the United States" should be treated equally. Therefore, the Human Rights Impact Litigation Clinic is planning to challenge the constitutionality of the burden of proof placed on US citizens born abroad.

Finally, it was April 9, and Saldivar had his hearing, where his documentation was deemed

insufficient. The Social Security Administration's annual employment records in Arizona went back only to 1959. ICE wanted the additional two years to verify Isidoro Saldivar's US residence the entire ten years before René's birth in 1967. Hartzler was hoping the Washington office had the fifty-one-year-old employment records. René would begin his eighth month in detention.

Giving Saldivar his liberty while ICE figured out the paperwork would have made sense because of his family's roots in Stanislaus County, going back to 1940. In addition, NYU's Morawetz says that doing otherwise may be unlawful: "I believe they don't have the power to put a detainer on someone and figure it out later. It's an abuse of the detention power. They only have jurisdiction over people who are noncitizens."

When ICE detains and deports US citizens, it is not only illogical; it also can be false imprisonment, a felony. When I asked Rosenbaum, Guzman's ACLU attorney, why the government wasn't prosecuting ICE agents for civil rights and criminal violations, he laughed and said, "Good luck!" Rosenbaum said the ACLU's complaint was alleging false imprisonment, but US Attorneys were defending the government in the lawsuit. No US Attorneys have stepped forward to prosecute ICE agents. Meanwhile, immigration judges, many of whom are patronage appointments from the Bush Administration or former ICE agents, entertain the flimsiest of arguments on behalf of deportation.

The case of Anna (not her real name), arrested in Phoenix on October 8, 2007, for prostitution, is particularly tragic. When the police asked for her place of birth she answered, "Paris." When applying under another name for a US passport, in 1991, Anna wrote that she was from Tehran. According to Hartzler, Anna also claims JFK is her father and the Pope is her father. Anna is from France the way that Borat is from Kazakhstan. In February 2007 an Arizona Superior Court dismissed drug charges against Anna, finding her "unable to understand the nature of the proceedings" as well as "criminally incompetent and a danger to herself and others." Anna has been diagnosed as paranoid schizophrenic.

On October 9, based only on her claim to have been born in Paris, Anna was taken to the Eloy Detention Center, where an ICE agent took full note of her US passport application and "8 different aliases, and 2 SSNs." On February 20 immigration judge Thomas Michael O'Leary, who had Anna's records, including the diagnoses of the court psychiatrists, issued an order to remove Anna from the country. The French consulate refused to issue travel documents for her, telling ICE that Anna is not a French citizen. Having been possibly stripped of her citizenship rights in violation of the Fourteenth Amendment and the Americans With Disabilities Act, Anna will be held in detention for at least three months. If released, she is not functional enough to attend the meetings ICE requires of aliens remaining in the country with deportation orders. A warrant for her arrest will be issued, and in her next encounter with law enforcement the warrant will trigger an arrest. Kristine Brisson, the ICE agent initiating Anna's removal, did not return messages requesting comment. Judge O'Leary has been promoted to run the Tucson Immigration Court.

Anna's case may seem unusual, but US citizens with mental disabilities reflect the criminal inmate population ICE targets. According to a 2006 Justice Department press release, about 40 percent of the incarcerated population has "symptoms of mania." Twenty-four percent of the jail population and 15 percent of state prisoners have a "psychotic disorder, such as delusions or

hallucinations." Rachel Rosenbloom of the Center for Human Rights and International Justice in Boston testified to Congress, "It is not uncommon for someone who is mentally ill and suffering from delusions to state that he or she was born abroad." By using the incarcerated population as its hunting grounds, ICE is inevitably going to snare mentally ill US citizens. The immigration judge observed, "If you don't have your marbles, or someone on the outside, there's no safety net."

Carlos Barrios, a Los Angeles private attorney who has represented US citizens in detention, notes, "It is strange. How can they keep a person detained in an immigration facility if they're a citizen?"

In response to different versions of this question from members of Congress in February, ICE's Mead pretended that the events brought before him did not exist. He repeated the law stating that ICE has no jurisdiction over US citizens, and then affected ignorance of ICE agents detaining US citizens. Mead was in the same room as US citizens testifying to ICE abuse. At one point Illinois Democrat Luis Gutierrez exploded in frustration over Mead's failure to have any comment on a racial-profiling incident in Chicago during which ICE detained more than 100 Latino men: "Thank you very much for not knowing any of the information about a very well-publicized case on which Secretary Chertoff has been well informed!"

The official line, as ICE public affairs officer Brandon Alvarez-Montgomery explained it to me, is that ICE does not "knowingly detain US citizens." This is false. Hartzler showed an ICE attorney the Minnesota birth certificate of Thomas Warziniack, and yet ICE held him for two weeks until his hearing. Morawetz described a citizen in detention whose attorney faxed a New York birth certificate "and detention says, 'How do we know this is that person's record?'" even though the law requires ICE to prove otherwise.

While Saldivar remained in detention, I sent Alvarez-Montgomery the details of his case, explaining that Social Security employment records for Saldivar's father did not exist before 1959. He responded, "Anyone who[se] first year of earnings were recorded between 1937 to the present will appear on the Social Security statement. For this case, it's safe to assume that 1959 was the first year of recorded earnings for his father."

Alvarez-Montgomery was wrong. Later, using ancestry.com, I found a Railroad Retirement Board (RRB) record for Isidoro Saldivar from before 1951. I sent it to Alvarez-Montgomery and other ICE officials. They did not reply or release René. I sent it to Hartzler, who contacted the RRB, which provided records of "compensation received by René's father each year from 1947 to 1958, as well as a copy of his application for a Social Security card in 1947." Hartzler gave these to ICE, which held René for six more days, releasing him on April 28.

Shortly after that I asked Saldivar, who was drywalling his sister's home in Chowchilla, how he understood what happened. "Someone took me to prison, even though I had my papers. It's bad. It's not fair," he told me. ICE alleged that René lacked legal permission to reside in the United States. Even if ICE is correct, the charge of undocumented residence is a minor civil infraction that requires release to be disputed and is not a crime. ICE's false imprisonment of US citizens and other legal residents, however, is a serious crime.

**About Jacqueline Stevens**

Jacqueline Stevens is an associate professor in the Law and Society Program at the University of California, Santa Barbara. She is completing her second book *States without Nations*. For more information, please see **http://www.jacquelinestevens.org**. **more...**

**Copyright © 2008 The Nation**