**SARA M. PELOQUIN**
California State Bar No. 254945
**MICHELLE BETANCOURT**
California State Bar No. 215035
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467
Email: sara_peloquin@fd.org

Attorneys for Mr. Ayon-Cortez

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE IRMA E. GONZALEZ)**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 08CR0283-IEG |
| ) | |
| Plaintiff, ) | Date: August 15, 2008 |
| ) | Time: 2:00 p.m. |
| v. ) | |
| ) | **REPLY TO GOVERNMENT'S RESPONSE** |
| ) | **REGARDING ADMISSIBILITY OF THE** |
| **ENRIQUE AYON-CORTEZ,** ) | **TESTIMONY OF THE DEFENSE'S** |
| ) | **PROPOSED EXPERT** |
| Defendant. ) | |
| ) | |
| ) | |

## I.

## STATEMENT OF FACTS.

Mr. Ayon intends to call Professor Jacqueline Stevens, an expert on the effect of the law on membership in political and social classes to testify during his jury trial in the above-referenced criminal matter. As indicated by Professor Steven's attached curriculum vitae, she is an Associate Professor of Law and Society at the University of California, Santa Barbara who has published and taught extensively in her area of expertise. See Exhibit A.

Mr. Ayon anticipates that Dr. Stevens will testify regarding her research into the number of United States citizens held in immigration custody for at least one month in deportation proceedings. She will testify regarding the number of detainees who claim United States citizenship who are deported or agree to be deported in order to avoid indefinite incarceration. She will testify that Immigration and Customs

1  Enforcement (ICE) keeps no records of persons who make claims to United States citizenship during
2  deportation proceedings, as well as to ICE's policy of appealing orders to terminate proceedings when
3  detainees raise these claims. Dr. Stevens will testify that ICE does no investigation to legitimate the
4  citizenship claims of the detainees and detainees are forced to prove their citizenship in order to secure their
5  release. Ultimately, she will testify that in her opinion admissions regarding alienage in deportation and
6  criminal proceedings are tainted by the coercive prospect of lengthy or indefinite custody, making statements
7  of alienage in this context less reliable because detainees with citizenship claims are faced with the choice
8  of their citizenship or their liberty.
9      The research undertaken by Dr. Stevens falsifies the theory that ICE does not detain or deport United
10  States citizens. It also falsifies the theory that all ICE detainees who admit they are aliens do so because they
11  are not United States Citizens. Dr. Stevens research includes interviews of immigration attorneys, ICE
12  officials and ICE detainees and deportees, law enforcement agents in jails, prisons, and probation and parole
13  officers, as well as allegations from pending and settled lawsuits against ICE. Dr. Stevens interviewed
14  attorneys from four federally funded non-profits providing legal services to persons in deportation
15  proceedings. Ten percent of ICE detainees from around the country are held in in Southern Arizona. Based
16  on data gathered from the Florence Immigrant and Refugee Rights Project (FIRRP) in Florence Arizona
17  which provides services to this population Dr. Stevens was able to make nation-wide estimates based on
18  FIRRP's substantial case-load. The information obtained from these sources form the basis of her opinions.
19  Some of her research on this subject was published in article format in *The Nation* in a piece entitled *Thin
20  ICE*. See Exhibit B. In this article she estimates that between 3,500 and 3,700 U.S. citizens were detained
21  or deported by ICE between 2004 and April of 2008. Dr. Stevens presently has a manuscript under review
22  with Columbia University Press titled *States Without Nations: Citizenship for Mortals,* which also draws
23  upon the research conducted for the article in *The Nation*. Dr. Steven's research into the detention and
24  deportation of U.S. citizens is on-going and further peer-reviewed publications are planned.
25      The theories tested were also based on initial research conducted for the book *Reproducing the State*,
26  Stevens, Jacqueline, Princeton University Press (1990). That research documents the history of citizenship
27  laws since antiquity and then shows how they are used to create groups. This book and related chapters and
28

articles have been cited to in other peer-reviewed publications by legal scholars, political scientists, anthropologists and historians.

The approach used in conducting this study was based on the work of Karl Popper, especially as described in his works, *Logic of Scientific Discovery* (1959), and *Conjecturess and Refutations: The Growth of Scientific Knowledge* (1963). The important difference between Popper's understanding of the scientific method and the method incorrectly used by social scientists is the latter's reliance on probability. Popper did not believe that theories could be verified this way for the simple reason that even a high correlation of variables in the social sciences would be .3, meaning that 70 percent of the cases either falsify or do not verify the theory.

## II.

### DR. STEVENS IS A QUALIFIED EXPERT.

Under Federal Rule of Evidence 702, a an expert witness must have scientific, technical or other specialized knowledge. Fed. R. Evid. 702. Dr. Stevens is a qualified expert in the field of social sciences, in particular the effects of the law on the formation of social groups and political membership. She has published a book, *Reproducing the State*, which discusses the history of the law governing United States citizenship and its effect on various classes of people. She holds a Masters degree and a Ph.D. in Political Science from the University of California at Berkeley. See Exhibit A. Since 2003 she has been an associate professor at the University of California at Santa Barbara. Id. She teaches classes in the Law and Society program. Id. Dr. Stevens is well versed in the research methodology and epistemology of the social sciences and has taught and published on the subject.

## III.

### THE TESTIMONY OF DR. STEVENS IS ADMISSIBLE UNDER RULE 702 AND *DAUBERT.*

Expert testimony is admissible if it will assist the trier of fact to determine a fact in issue and it is: 1) it is based upon sufficient facts or data, 2) it is the product of reliable principles and methods, and) the witness has applied the principles and methods reliably to the facts of the case. Fed R. Evid. 702. In determining whether proposed expert testimony meets this standard the Court must determine whether the

1  proffered testimony is relevant and reliable.  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579
2  (1993); Kumho Tire Company, Ltd., v. Carmichael, 526 U.S. 137 (1999).

**A.     Dr. Stevens Testimony Is Relevant To The Question Of Alienage An Essential Element Of The Charged Offense.**

Mr. Ayon's previous briefing to the Court addressed the relevance of Dr. Stevens' proposed testimony.  He re-incorporates his previous arguments here.

**B.     Dr. Stevens' Opinions Are Based On Reliable Research.**

In determining the reliability of the proffered testimony, the Court *may* consider the following factors: 1) whether the theory can or has been tested, 2) has been subjected to peer review and publication, 2) the known or potential rate of error and the standards controlling the technique's operation, 3) whether the technique is generally accepted within the scientific community.  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); Kumho Tire Company, Ltd., v. Carmichael, 526 U.S. 137 (1999).  These factors apply to testimony that is scientific in nature as well as to other expert or testimony to the extent that they are reasonable measures of the reliability of the proffered expert's testimony.  Kumho, 526 U.S. 137, 151-152. "Rule 702 is applied consistent with the liberal thrust of the Federal Rules and their approach of relaxing the traditional barriers to opinion testimony." Jinro America Inc., v. Secure Investments, Inc., 266 F.3d 993 (9th Cir. 2001) *quoting* Daubert, (*internal quotations omitted*).

Dr. Stevens tested the validity of the hypothesis that ICE does not detain or deport United States Citizens.  Her conclusions are based on information provided by primary sources namely: immigration attorneys, ICE official and deportees, law enforcement and by reviewing allegations of pending and settled lawsuits against ICE.  The government argues that this study is too small to be reliable (See Gov't Response at page 7, lines 5-12), however, it is based on data from a significant portion of the population detained and deported by ICE on a yearly basis. As part of her research Dr. Stevens interviewed attorneys from four federally funded non-profits providing legal services to persons in deportation proceedings.  Ten percent of ICE detainees from around the country are held in  in Southern Arizona.  Based on data gathered from the Florence Immigrant and Refugee Rights Project (FIRRP) in Florence Arizona, which provides services to this population, Dr. Stevens was able to make nation-wide estimates based on FIRRP's substantial case-load. The government suggests in its responsive briefing that Dr. Stevens testimony might encourage jurors to

1 resort to cultural stereotypes. This argument is unfounded. Dr. Stevens' proffered testimony does not include any reference to a specific culture or race which might encourage jurors to engage in stereotyping. Rather her testimony relates to instances of ICE detention and deportation of *Americans*. To the extent that the government questions the reliability or representative quality of this data it is a proper subject for cross-examination, which the jury may consider when weighing of the evidence.

Dr. Stevens used methodology approved by the social sciences community and her conclusions are readily tested. Dr. Stevens research methods followed methods as laid out by Karl Popper in his works *Logic of Scientific Discovery* (1959), and *Conjecturess and Refutations: The Growth of Scientific Knowledge* (1963). The research Dr. Stevens wrote about in *The Nation* are incorporated in a text presently being peer-reviewed for publication by the Columbia University Press. The nature of the differences between the natural and social sciences make considerations of the rate of error inapposite in evaluating the reliability of Dr. Stevens' proposed testimony.

In sum, Dr. Stevens opinions are testable, based on sufficient data, obtained based on sound methodology that is presently subject to peer review. Therefore, Dr. Stevens testimony should be admitted as it is based on research sufficient to meet the requirements of Rule 702 and <u>Daubert</u>.

## IV.

## **CONCLUSION**

For these reasons, Mr. Ayon should be allowed to present his defense expert as proffered.

Respectfully submitted,

Dated: August 14, 2008        */s/ Sara M. Peloquin*
**SARA M. PELOQUIN**
**MICHELLE BETANCOURT**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Ayon-Cortez

**CERTIFICATE OF SERVICE**

Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of her information and belief, and that a copy of the foregoing document has been served this day upon:

Stewart Young

Stewart.Young@usdoj.gov; efile.dkt.gc1@usdoj.gov,

Dated: August 14, 2008

 */s/ Sara M. Peloquin*
SARA M. PELOQUIN
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, CA 92101-5030
(619) 234-8467  (tel)
(619) 687-2666  (fax)
e-mail: sara_peloquin@fd.org